Richard SEWING, Appellant,

v.

Steven Wayne BOWMAN, as Personal Representative of the Estate of William C. Bowman, Appellee.

No. 01–10–00230–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 29, 2012.

Rehearing Overruled May 29, 2012.

Latosha Terrell Razz Lewis, Tiffany Bingham Briscoe, Vorys, Sater, Seymour and Pease LLP, Houston, TX, for Appellant.

Dwaine Morris Massey, Benton Massey LLC, Martin J. Siegel, Law Offices of Martin J. Siegel, PC, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, HIGLEY, and BROWN.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Richard Sewing, challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Steven Wayne Bowman, as Personal Representative of the Estate of William C. Bowman ("Bowman"), in Bowman's suit against

Sewing for redemption of partnership interest [1], breach of contract, unjust enrichment, and breach of fiduciary duty.[2] In thirteen issues, Sewing contends that the statute of frauds [3] precludes Bowman's claim for recovering a redemption of partnership interest; the trial court erred in considering Sewing's previously-owned property as partnership assets; the evidence is legally and factually insufficient to support the jury's finding that the parties formed a partnership; the evidence is insufficient to establish the necessary elements of an enforceable contract or agreement; Bowman failed to present competent evidence of the market value of the partnership; the evidence is insufficient to support the jury's damage award; the jury's damage award is excessive and against the great weight of the competent evidence presented at trial; and the trial court erred in not providing set-offs to the jury's calculation of Bowman's partnership redemption interest, awarding Bowman attorney's fees, and not submitting Sewing's requested jury instructions.

We affirm.

## Background

Bowman sued Sewing, seeking redemption of a partnership interest and damages for breach of contract, unjust enrichment, and breach of fiduciary duty. In his petition, Bowman alleged that he and Sewing "entered into [a]n agreement in or around 2003 wherein Bowman provided in excess of $260,000 to [Sewing] between 2003 and 2005 as capital for the purpose of acquiring and rehabilitating real property located at 1718 Wentworth ... and 4810 Chenevert" in Houston, Texas. Bowman and Sewing were to each own 50 percent of the two properties, which were held in the name of Sewing and his wife, Patricia Sewing, and the money sent from Bowman was deposited into the Sewings' checking account. Bowman asserted that the goal "was to create a partnership and combine their resources and make a profit on the appreciation in the value of the properties and share in rental income until the properties were later sold." Although Bowman died on June 8, 2005, Sewing did not contact Bowman's estate regarding the property or "make an offer to redeem Bowman's interest."

In regard to Bowman's claim for "Redemption of [Partnership] Interest," Bowman asserted that the parties had formed a partnership "to carry on a business for profit," Sewing is the "only remaining partner of the Partnership," Bowman, "[u]pon his death[,] ... became a withdrawn partner and is entitled to ... buyout rights and remedies," and, because "Sewing has not offered to the Estate to purchase Bowman's interest nor tendered any payment to the Estate," the Estate is entitled to the "fair market value of the partnership as of the date of Bowman's death."

In regard to Bowman's separate breach-of-contract claim, Bowman asserted that the parties "had an agreement that they would each contribute to the purchase of [certain] properties and in turn, would each own 50% of the properties and share in the rents and profits generated," Bowman "provided over $260,000 to [Sewing] to be used for the purchase and rehabilitation of the properties," Sewing "kept that money" and "refused to share with Bow-

---

1. *See* Tex.Rev.Civ. Stat. Ann. art. 6132b–7.01 (Vernon 2010).

2. Bowman's claim for breach of fiduciary duty was not submitted to the jury.

3. *See* Tex. Bus. & Com.Code Ann. § 26.01 (Vernon 2009).

man the revenues from the rental and sale of the properties," and "[s]uch conduct is a breach of the agreement between the parties, causing damage to Bowman in an amount in excess of $500,000.00."

In regard to Bowman's unjust-enrichment claim, Bowman asserted that "the parties understood and agreed that they would each own 50% of the properties and would share equally in the rents and profits," Sewing's "receipt of over $260,000.00 from Bowman" and his "retention of all rents and revenues from the properties is unjust and immoral," Sewing has been unjustly enriched "by keeping the more than $260,000.00 provided by Bowman and in keeping the revenues from Bowman," and Bowman "is entitled the reasonable value of the benefit conferred ... which is in excess of $500,000.00."

Sewing testified by deposition that he had met Bowman in the early 1950's and, in October 2003, he and Bowman each invested $50,000 in "Rescue Properties." On February 6, 2004, Sewing received on their investment from Rescue Properties a payment of $136,550, which included the $50,000 that each had invested and a profit of $18,275 each for Bowman and Sewing. Sewing explained that he and Bowman wanted to continue to invest in Rescue Properties, and Bowman sent Sewing another $50,000 to invest; however, Rescue Properties stated that it did not "need [their] money." Sewing and Bowman then decided to reinvest the money into a similar endeavor, so Sewing held Bowman's $118,275. Sewing later "proposed" that Bowman "might be interested in" developing two properties owned by Sewing. The purpose of the development, according to Sewing, was to build townhouses and sell them for a profit. Sewing and Bowman had a "conversation" about developing the two properties, and Sewing "put [a] document together per [their] conversation."

Sewing explained that the agreement required Bowman to first pay Sewing $300,000 to receive "50 percent" of the two properties. Sewing, in explaining his valuation of the properties, stated, "[Bowman was] buying into something that's worth $600,000. And so if you've got half interest in it—it's worth $600,000 from what I'm seeing here—then we entered equally." Sewing further explained, "I'm selling him half of something I already own. That $300,000 goes in my pocket.... Now we're equal partners.... If I sell him half interest ... in something I own, that belongs to me." Sewing was then asked, "So you were going to take this $300,000, put it in your pocket; is that right?" To which he responded, "If he had accepted it."

Sewing stated that he and Bowman were to develop townhomes on the two pieces of property, which were to be investment properties. He noted that although the Chenevert property was to be strictly an investment property, Bowman, in February 2004, told Sewing that he might want to live on the property. Sewing explained that at that time, he still held $118,275 of Bowman's money for investment purposes.

Sewing kept the $68,275 owing to Bowman from the Rescue Properties investment in his checking account. Two weeks before Sewing purchased the Chenevert property, he had received the additional $50,000 from Bowman, but he explained that none of this money was used toward the down payment on the Chenevert property. Bowman continued to contribute additional funds, and, at the time of his death, he had paid Sewing $223,275, leaving a remaining balance of $76,725 to reach his $300,000 total contribution. Sewing prepared two documents, which Bowman introduced into evidence at trial, recording the payments. The first document, entitled, "BOWMAN–SEWING TRANSACTIONS," and the second document, enti-

tled, "BOWMAN–SEWING PROPERTY TRANSACTIONS As of 12/2/2004," tracked the various payments that Bowman had made to Sewing in connection with their investment in Rescue Properties and the subsequent investment plan.

Approximately one year after Bowman's death, Sewing put the Chenevert property, which was appraised for $700,000, on the market. Sewing originally had purchased the Chenevert property for $170,000. Although the Wentworth property at one time had had an abandoned building on it, Sewing tore it down and left the property vacant. Sewing eventually sold both of the properties, and townhomes are now built on the properties.

At trial, Sewing testified that after he and Bowman had received the money back from their investment with Rescue Properties, Bowman came to visit him in Houston in February 2004. Although Bowman had sent more money to Sewing to reinvest in Rescue Properties, Bowman did not want Sewing to return the money once they found out that Rescue Properties did not want their investment. While Bowman was in Houston, he visited the properties and saw "the potential" for developing townhouses on them. Sewing drafted a proposal for Bowman "to buy half of [his] land . . . but he never took the proposal." Sewing then drafted a letter to Bowman, stating that Bowman, pursuant to their discussion, would buy 50 percent of the properties and own half of the land, and Sewing was having the legal documents prepared. Sewing noted that he informed Bowman of the legal documents because in "real estate dealings, any time you're selling land you go to a title company."

Sewing explained that after they were unable to reinvest in Rescue Properties, Bowman wanted to make a similar investment. Then, Sewing offered to let Bowman buy one-half of his properties.

Sewing "needed [Bowman's] financial statement" because they would need to borrow "probably $3 million for interim financing." According to their plan, the men were to build nine condominiums on the two pieces of property. However, they did not "go forward with that plan" because Bowman "just sat on the letter" as he was "looking for something fast, where you double your money."

After Bowman left Houston and returned to Minnesota, he began "talking about" moving to Houston, and he recommended that the two repair the "old teardown house" located on the Chenevert property. Bowman wanted to "fix it up" and live in it, and he offered to "put the money in it." Sewing then began to remodel the house with the money from Bowman and the $200,000 he had contributed. He explained that the changes made to the property were not to increase its value, but for Bowman to live in it. Sewing stated that the men considered the development to be "on hold," but Sewing was "comfortable" doing that because he wanted Bowman to move to Houston. Sewing noted that the total amount of money he had received from Bowman was used to renovate the Chenevert property.

Sewing explained that he knew that Bowman's health was "bad," but he was not aware of how bad it was until Bowman's cousin alerted him that Bowman was very ill. Sewing then went to Minnesota, where he found Bowman in very bad condition, and Sewing had to call for emergency assistance to take Bowman to the hospital. Sewing then returned to Houston to discuss plans to "airlift" Bowman to Houston, but Bowman died before he could be transported.

At the time of Bowman's death in June 2005, the renovations on the Chenevert house were approximately 90 percent complete, and Sewing then had them complet-

ed. In July 2005, Sewing had the property appraised for a value of $390,000. However, Sewing engaged some realtors, who estimated its value at $600,000 to $700,000. Sewing ultimately sold it for $450,000. He owed approximately $130,000 on a mortgage on the property, and he explained that he "lost a large amount of money" on it. Sewing noted that he did not go to Steven Bowman, Bowman's son, for the losses that he had incurred on the property because "this wasn't business. This was for [his] friend."

Sewing explained that his deposition testimony about the sharing of profits and losses was in regard to what "would have been if we had developed the property and made the townhouses but we never did." He knew that "there was no way [he] could make any money out of" the renovated property, but he renovated the property because that is what Bowman wanted.

On cross-examination, Sewing stated that he did not document any of the costs of remodeling the Chenevert property "because that was friendship." Sewing also explained his deposition testimony about Bowman's contribution of $300,000 and their being "equal partners," stating, "I didn't say if he gave me $300,000 we would be equal partners. If he ... bought the land of these two properties for $300,000 then that would consummate. He never agreed to that." Sewing asserted that Bowman had paid him only $211,000 and explained that the two men would have been partners if Bowman had agreed to his proposal to buy one-half of the properties, but the partnership never formed because Bowman became ill and all of his money "went into developing that house for him to live in."

Craig LeVesseur, a certified financial planner, testified by deposition that he had provided financial planning services to Bowman since 2000. He explained that he would meet with Bowman approximately once every six months to discuss Bowman's goals, priorities, and current financial situation. LeVesseur also noted that during his meetings and telephone conversations with all of his clients, including Bowman, he would take notes that he would later use to create an annual written report. He explained that Bowman would keep him "abreast of his investments on a regular basis." In their first meeting, LeVesseur made the following notes of his conversation with Bowman: "Invest in Houston land/homes," "$145k invested so far," "will be adding another one $155k to this project," "Expected to mature in two to three years," and "[Bowman] is expecting 2 to 3 million out of it."

At a later meeting with Bowman on June 3, 2004, LeVesseur took notes that he used to compile a follow-up letter on June 7, 2004. In the follow-up letter, LeVesseur noted that Bowman "intend[ed] to add to [his] real estate investment opportunity with [Sewing] in Houston." LeVesseur did not recall if Bowman mentioned Sewing's name in this specific meeting, but he noted that "every other conversation" concerned "Richard."

LeVesseur again met with Bowman on December 30, 2004, and, pursuant to his ordinary practice, he took notes regarding the meeting. LeVesseur noted that, at this time, Bowman had to return to a hospital due to over-radiation from his cancer treatment, but Bowman "mentioned once he got his health back he wanted to go down to Houston and visit his friend." LeVesseur also noted, "In 2005/06, [Bowman] will need $76,000 for his obligation in the Texas land investment project." LeVesseur explained that Bowman considered the project an "investment opportunity" and never informed LeVesseur of any plans to move to Houston. He explained that his note of "2005–Alone Thirty to $40k

needed for Texas project" was in reference to Bowman needing $30,000 to $40,000 in 2005 to invest in the project. Subsequently, on February 15, 2005, LeVesseur had a telephone conversation with Bowman, and he made a note that Bowman "told me he will need 38,526 on April 15; 38,526 August 15" for the project in Texas.

On cross-examination, LeVesseur admitted that he did not have any personal knowledge that Bowman had filed any tax forms related to a partnership with Sewing. He had never seen any written agreements between Sewing and Bowman about their project, and he did not know exactly what the project entailed or involved. LeVesseur also did not know if Bowman had ever shared in any profits or had had a right to receive profits; he knew only that Bowman "expected to get 2 to 3 million back in a relatively short period of time." LeVesseur did not know if the endeavor "was going to be a partnership," but he knew that Bowman intended "to invest $300,000." He could not remember whether Bowman had "ever specifically said" that Bowman and Sewing were partners, but he knew that Bowman had "never showed [him] anything legally that suggested a partnership."

In regard to Bowman's claim for "Redemption of [Partnership] Interest," the trial court instructed the jury as follows:

A partnership is an association of two or more people to carry on a business, as owners, for profit. You may consider the following factors in finding a partnership between the parties (not all factors are necessary to form a partnership):

1) the right to receive a share of the profits;

2) expression of intent to be partners in the business;

3) participation or the right to participate in the control of the business;

4) sharing or agreeing to share in the losses of the business;

5) contribution or agreeing to contribute money or property to the business.

The jury found that Sewing and Bowman had "form[ed] a partnership *regarding* the properties located at 1718 Wentworth and 4810 Chenevert in Houston, Texas" and the value of Bowman's interest in the partnership at the time of his death was $231,743.61. (Emphasis added.)

In regard to Bowman's separate breach-of-contract claim, the trial court submitted the following question to the jury:

Did William C. Bowman and Richard Sewing bind themselves to a contract that included the following terms:

1) William C. Bowman's purchase of an one half interest or 50% ownership in the properties located at 4810 Chenevert and 1718 Wentworth for $300,000; and

2) The development of townhomes on both properties to make a profit.

The jury found that the parties had bound themselves to such a contract. However, the jury further found that neither Bowman nor Sewing had failed to comply with the contract, and it found that Sewing was not unjustly enriched. Thus, the jury did not award Bowman damages on his breach-of-contract or unjust-enrichment claims.

Based on the jury's findings, the trial court entered judgment in favor of Bowman for actual damages of $231,743.61 on his claim for "Redemption of [Partnership] Interest."

## Statute of Frauds

In his first issue, Sewing argues that the trial court erred in denying his request for a directed verdict because Bowman's partnership claim is "wholly derivative" of an

agreement for the transfer in the interest of land and, thus, whether or not the partnership agreement technically included a transfer in the interest of land, enforcing the agreement would still be barred by the statute of frauds. In his second and third issues, Sewing argues that "[i]n order for [Bowman] to have prevailed at trial, the evidence had to conclusively establish as a matter of law that" the properties in question were "owned by the partnership" and, if purchased by individuals, any "oral transfer to the partnership is barred by the statute of frauds."

The statute of frauds requires that a promise, agreement, or contract for the sale of real property be in writing and signed by the party to be charged with the promise or agreement. TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4) (Vernon 2009). To satisfy the statute of frauds, a contract "must furnish within itself, or by reference to some other existing writing, the means or data by which the [property] to be conveyed may be identified with reasonable certainty." *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex.1972). Whether a contract falls within the statute of frauds is a question of law. *Iacono v. Lyons*, 16 S.W.3d 92, 94 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

Sewing argues that, "though couched in terms of a partnership agreement," Bowman's partnership redemption claim is "nothing more than a claim for [a] one-half interest in the Chenevert and Wentworth properties." In support of this argument, he cites *Trammel Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631 (Tex.1997). In *Trammel Crow*, the plaintiff, a real estate broker, brought an action for tortious interference of a written contract, which provided him the exclusive right to sell a property. *Id.* at 632. Underlying the written exclusivity contract was an oral agreement stating the terms of his com-

mission. *Id.* Although the plaintiff argued that his claims were "not for the recovery of a commission, but for tort damages," his requested amount of damages was equal to the commission he would have received under the oral commission agreement. *Id.* at 633–34. He alleged that the defendants had tortiously interfered with his ability to act as the exclusive representative; however, this agreement included no terms for the amount of commission, so any damages would still hinge on the unenforceable oral commission agreement. *Id.* at 634. The court ruled that such a result was directly contrary to the statutory mandate that "[a]n action may not be brought in a court in this state for the recovery of a commission for the sale or purchase of real estate unless the promise ... is in writing and signed by the party to be charged." *Id.* (citing TEX.REV. CIV. STAT. ANN. art. 6573a, § 20(b) (Vernon Supp. 1997)). Thus, because the plaintiff, through the tortious interference claim, was ultimately seeking "recovery of a commission for the sale or purchase of real estate," the statute of frauds barred recovery despite the fact that it was not brought as a breach-of-contract claim. *Id.*

Here, Bowman is not seeking to recover a commission for the sale or purchase of real estate, and the reasoning of *Trammel Crow* applies to Bowman's suit only if his claim for redemption of a partnership interest was an attempt to enforce an otherwise unenforceable contract for the sale of real estate. However, merely because the value of the properties is relevant to the value of Bowman's partnership interest does not compel the conclusion that he is attempting to enforce a contract for the sale of real estate. Bowman did not make a claim for a transfer of title in the two properties, and the jury was presented with evidence that he sought only the value of his partnership interest in a "part-

nership regarding the properties," i.e., one that involved the development of townhomes on the properties and then the sale of the two properties.

▇▇▇▇▇ "[A]n agreement to share in the profits of contemplated speculative deals in real estate simply does not involve the transfer of real estate, or an interest in real estate, within the meaning of the Statute of Frauds." *Berne v. Keith,* 361 S.W.2d 592, 597 (Tex.Civ.App.-Houston 1962, writ ref'd n.r.e.); *see also Wiley v. Bertelsen,* 770 S.W.2d 878, 881 (Tex.App.-Texarkana 1989, no pet.) ("The statute of frauds does not apply to an agreement to pay a certain sum of money out of the proceeds of a future sale of land."). Thus, Bowman's claim for redemption of his partnership interest may include an interest in the proceeds from the sale of the two properties without resulting in a transfer of interest in the two properties. Merely because a partnership agreement contemplates transactions in real estate does not transform the partnership itself

into a transaction for the sale of real estate, bringing it under the statute of frauds. *See Berne,* 361 S.W.2d at 597. Thus, Sewing has not established, as a matter of law, that the statute of frauds applies to the partnership agreement. Accordingly, we hold that the trial court did not err in denying his motion for directed verdict.

In his second and third issues, Sewing argues that the Wentworth and Chenevert properties cannot be considered as "partnership assets" because "any oral transfer to the partnership" was "barred by the statute of frauds." However, the jury could consider the market value of the property to determine the "fair value" of Bowman's partnership interest, i.e., Bowman's entitlement to the proceeds of any future sale, without considering the properties themselves to be assets of the partnership. *See id.*

We overrule Sewing's first, second, and third issues.[4]

---

4. In support of his argument that the statute of frauds bars Bowman from recovering the value of his interest in the partnership formed with Sewing, our dissenting colleague asserts:

> The Court properly distinguishes between (1) an oral partnership agreement to transfer an ownership interest in land to a partner or the partnership—an agreement that violates the statute of frauds—and (2) an oral partnership agreement to develop land for resale and share in the sale profits without transferring an ownership interest in the land—an agreement that does not.... But, contrary to the Court's holding, the agreement alleged at trial and found by the jury falls within the first category rather than the second, and the damages Bowman recovered depend on that unenforceable oral agreement.

(citations omitted). However, contrary to our colleague's assertion that this case concerns two "oral partnership agreement[s]," Bowman actually asserted against Sewing two separate and distinct claims: (1) a claim for redemption of Bowman's interest in the part-

nership *"regarding* the properties located at 1718 Wentworth and 4810 Chenevert in Houston, Texas" (emphasis added) and (2) an alternative breach-of-contract claim that concerned Bowman's "purchase of an one half interest or 50% ownership in the properties located at 4810 Chenevert and 1718 Wentworth for $300,000." As outlined above, these distinct claims appear separately in Bowman's "Original Petition and Request for Disclosure," and the trial court submitted the two different claims to the jury for separate findings and damage awards.

In order to find that Bowman and Sewing had formed a partnership "regarding" the pertinent properties, the jury need not have believed that Bowman had also specifically agreed to purchase an interest in the properties. And, in order to find that Sewing had failed to comply with a contract to sell an interest in the pertinent properties, the jury need not have believed that Bowman and Sewing had formed a partnership. Indeed, although the jury found that Bowman and Sewing had formed a partnership, it separately found that neither Bowman nor Sewing

## Partnership Agreement

■ In his fourth issue, Sewing argues that the evidence is legally and factually insufficient to establish an enforceable agreement or contract between him and Bowman because Bowman failed to pay $300,000 for a one-half interest in the Chenevert and Wentworth properties. In his fifth issue, Sewing argues that the evidence is legally and factually insufficient to establish the necessary elements of a contract between the parties because Bowman failed to present "evidence of acceptance," a "meeting of the minds," the terms of any agreement, and delivery or performance of any agreement. In his seventh issue, Sewing argues that the evidence is legally and factually insufficient to establish the formation of a partnership because there is no evidence of a partnership contract, no testimony that Bowman had expressed an intent to enter a partnership, no evidence to show an agreement to share profits and losses, and Bowman's payment of $300,000 was a required condition of any partnership agreement.

### Standard of Review

We will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). In conducting a legal sufficiency review, a court must consider the

evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *Id.* However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* A reviewing court cannot substitute its judgment for that of the fact finder, so long as the evidence falls within this zone of reasonable disagreement. *Id.*

In reviewing a factual-sufficiency challenge, we consider and weigh all of the evidence supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *see Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual-sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial, it must show that there is insufficient evidence to support the adverse finding. *Vongontard v. Tippit,* 137 S.W.3d 109, 112 (Tex.App.-Houston [1st Dist.] 2004, no pet.). The jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

### Evidence of Contract

In his fifth issue, Sewing argues that Bowman cannot recover on his partnership claim without also proving the existence of a contract because "to sustain a cause of action for redemption of a partnership interest, the alleged partnership must be

had failed to comply with an agreement for Bowman to purchase an interest in the properties. Thus, our dissenting colleague's conclusion that the statute of frauds bars Bowman's claim for "Redemption of [Partnership]

Interest" is based entirely on a false premise and the conflation of two separate and distinct theories of liability. And the statute of frauds does not bar Bowman's claim for "Redemption of [Partnership] Interest."

based on a valid, enforceable agreement like any other contract."

In support of his assertion, Sewing relies on *Volpe v. Schlobohm*, 614 S.W.2d 615 (Tex.Civ.App.-Texarkana 1981, no writ) and *Ferch v. Baschnagel*, No. 03–04–00605–CV, 2009 WL 349149 (Tex.App.-Austin Feb. 13, 2009, no pet.) (mem. op.). In *Volpe*, the court applied the contractual concept of rescission to a partnership, stating that a "partnership agreement, like any other agreement or relationship, may be rescinded when proper grounds exist." *Volpe*, 614 S.W.2d at 617. The existence of a partnership agreement was not in dispute, and the elements of contract formation were not discussed. *Id.* at 617. Rather, the court only applied the concept of rescission to a written partnership agreement in determining whether rescission was a proper remedy in the parties' dispute. *Id.*

In *Ferch*, a party brought suit for breach of a partnership agreement, and the court discussed the evidence supporting the finding of such an agreement. *Ferch*, 2009 WL 349149, at *1. The court stated, "It is well established that, 'even if an offer and acceptance are not recorded on paper, dealings between parties may result in an implied contract where the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement.'" *Id.* at *9. (citing *Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 348 (Tex.App.-Fort Worth 1996, no writ); *City of Houston v. First City*, 827 S.W.2d 462, 473 (Tex.App.-Houston [1st Dist.] 1992, writ denied)). The court went on to state that "because the jury was required to determine if there was a 'meeting of the minds'" for the plaintiff to recover on his breach-of-contract claim, "it was *necessary* for the jury to determine" whether the plaintiff and defendant had agreed to form a partnership. *Id.; see also Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (holding that dispositive issue in determining whether contract exists is intent of parties to be bound, without which there can be no contract upon which to base breach-of-contract action); *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685, 689 (Tex.App.-San Antonio 2002, pet. denied). Although the court in *Ferch* did reference the elements of contract formation, it did not state that a plaintiff must provide evidence on each of the elements of a contract claim to establish the formation of a partnership. *Id.* at *9–10. Rather, the court looked at the factors indicating existence of a partnership agreement. *Id.*

■ Partnership formation may be implied from the facts and circumstances of a case. *Elhamad v. Quality Oil Trucking Service, Inc.*, No. 2–02–412–CV, 2003 WL 22211543, at *3, (Tex.App.-Fort Worth Sep. 25, 2003, no pet.) (mem. op.) (citing *Cavazos v. Cavazos*, 339 S.W.2d 224, 226 (Tex.Civ.App.-San Antonio 1960, writ ref'd n.r.e.)); *see also Shindler v. Marr & Assocs.*, 695 S.W.2d 699, 703 (Tex.App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.). In *Ingram v. Deere*, the Texas Supreme Court, in deciding whether the parties had formed a partnership, did not apply the elements of a contract claim to the oral partnership agreement; rather, it looked at the totality of the circumstances and the elements of partnership formation. 288 S.W.3d 886, 891 (Tex.2009). Accordingly, we conclude that, in regard to Bowman's partnership claim, Bowman need not prove each element establishing the existence of a contract.[5]

We overrule Sewing's fifth issue.

5. We note that although the jury did also find that Sewing and Bowman had a contract,

### Existence of a Partnership Formation

 Under the Texas Revised Partnership Act ("TRPA"),[6] factors indicating the formation of a partnership include: (1) receipt or right to receive a share of profits of the business; (2) expression of intent to be partners in the business; (3) participation or right to participate in control of the business; (4) sharing or agreeing to share losses and liabilities of the business; and (5) contributing or agreeing to contribute money or property to the business. Act of May 31, 1993, 73d Leg., R.S., ch. 917, § 1, 1993 Tex. Gen. Laws 3890 (expired Jan. 1, 2010) (former article 6132b–2.02(a)). Unlike at common law, the TRPA "does not require proof of *all* of the listed factors in order for a partnership to exist." *Ingram* 288 S.W.3d at 896. Rather, whether a partnership exists is to be determined by looking at the "totality of the circumstances" and considering "all of the evidence bearing on the TRPA partnership factors." *Id.*

In regard to the factors indicating partnership formation, we note, first, that Sewing asserts that there are no documents or testimony establishing that Bowman had a right to sharing any profits from a partnership regarding the Wentworth and Chenevert properties. He argues that although he testified that he and Bowman would have shared in any profits if a partnership had been formed, his "answer was conjecture and clearly conditioned on a circumstance that never occurred-the men's joint ownership of the properties." He asserts that he "was indulging counsel in his questions and guessing what the terms would have been, assuming co-ownership of the property occurred."

Bowman points to the following testimony at trial as evidence of profit sharing:

[Bowman's Counsel]: And you and Bill were going to share in the profits of it?

[Sewing]: The—

[Bowman's Counsel]: The investment?

[Sewing]: The development, yes.

Sewing's testimony constitutes some evidence that he and Bowman had an agreement to share profits in regard to the development of the Wentworth and Chenevert properties. *See Hoss v. Alardin,* 338 S.W.3d 635, 643 (Tex.App.-Dallas 2011, no pet.) (holding testimony that parties "were going to split profits" was sufficient to uphold finding of right to receive profits even though it "could be interpreted [as] an agreement to agree"). Sewing's own admission that the parties were to share profits constitutes evidence of the "receipt or right to receive a share of profits of the business." *See* TRPA art. 6132b–2.03(a)(1).

In regard to whether Sewing and Bowman had expressed an intent to be partners, Sewing argues that Bowman presented no evidence because there is no testimony or documents created by Bowing that refer to Sewing as his "partner" in business, LeVesseur "admitted that he could offer no competent testimony that Sewing was Bowman's business partner," and "Sewing's testimony that if Bowman [had] purchased half ownership interest in the two properties, then Sewing would have considered them [to] be equal partners is no evidence at all of an actual expressed intent by the men to be partners."

 The expression-of-intent factor requires "an inquiry separate and apart from

Bowman did not recover on his breach-of-contract claim.

6. Although TRPA expired on January 1, 2010, it was in effect during the events made the basis of this lawsuit.

the other factors," and courts should "only consider evidence not specifically probative of the other factors." *Ingram*, 288 S.W.3d at 900. Courts should review the "putative partners' speech, writings, and conduct" in determining whether the parties had expressed an intent to be partners. *Id.* at 899. Additionally, "there must be evidence that both parties expressed their intent to be partners." *Id.* at 900.

In support of this factor, Bowman points to Sewing's testimony that the men would be "equal partners." Here, Sewing testified as follows:

> [Sewing]: I'm selling him half of something I already own. That $300,000 goes in my pocket. That's mine. Now we're *equal partners*, and we move forward. But I'm not—his money is not in for me to do that with. If I sell him half interest in my—in something I own, that belongs to me.
>
> [Bowman's Counsel]: So you were going to take this $300,000, put it in your pocket; is that right?
>
> [Sewing]: If he had accepted it.

(Emphasis added.) Although Sewing's testimony is that Bowman did not pay him $300,000, which he asserts was a required condition of any partnership, the jury could have reasonably inferred from this testimony that the two men had expressed an intent to be partners. *See id.* at 901. Thus, Bowman, through Sewing himself, presented some evidence that the men expressed an intent to be partners.

 In regard to an agreement to share in the losses of any partnership, Sewing argues that there is no evidence of such an agreement because there is no document reflecting such an agreement nor is there any credible testimony that either party agreed to share in any losses. The absence of an agreement to share losses is not dispositive of the existence of a partnership; however, the existence of

such an agreement could support Bowman's argument that a partnership existed between him and Sewing. TRPA art. 6132b-2.03(a)(4)(A). Sewing asserts that the "only testimony on the issue is Sewing's affirmative response to a hypothetical: 'And if the development took a bath, you would share in the losses?'" Sewing clearly stated that if the development had failed, both parties "would share in the losses." Moreover, the evidence is undisputed that Sewing was in possession of $223,275 that Bowman had provided to Sewing—money that Sewing had not returned. Thus, the record contains evidence from which the jury could have inferred an agreement to share losses.

Regarding any right to participate in the control of any partnership, Sewing asserts that there is no evidence that Bowman ever participated or had such a right. He asserts that it is "uncontroverted that Sewing owned both properties and controlled the maintenance, renovations and other operation on the properties." Further, Sewing asserts that his "testimony that if Bowman had purchased the half interest and agreed to develop the townhomes, Bowman would have 'some input in developing it' is not evidence that an agreement was in place concerning the properties.'"

 "The right to control a business" involves "the right to make executive decisions." *Ingram*, 288 S.W.3d at 901. Courts have considered various facts in deciding whether an individual had such a right to control, including the exercise of authority over a business's operations, the right to write checks on a business's checking account, control over and access to a business's books, and receiving and managing all of a business's assets and monies. *Id.* at 901–02. Sewing's testimony that Bowman would have had "some input in

developing" the properties does not constitute evidence of a right to make executive decisions. Such "input" does not necessarily include control over a business. *See id.* at 903 ("[O]wners talk with consultants, employees, accountants, attorneys, spouses, and many others about their businesses, and these conversations do not establish that these people have control of the business."); *see also Knowles v. Wright,* 288 S.W.3d 136, 147 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (holding that testimony that parties "made decisions together" did not constitute evidence of control where one party "retained ultimate control over business decisions"). Here, Bowman submitted no evidence that he made executive decisions or had the right to make such decisions.

In regard to any contribution or agreement to contribute property or funds to an alleged partnership, Sewing asserts that there is no evidence that Bowman made any such contribution or entered any such agreement. He further asserts that the "only funds mentioned in the testimony and documents were sent from Bowman to [Sewing] for the purchase of an ownership interest in the properties." He asserts that Bowman's contributions "would have been monies owed directly to Sewing to gain an interest in the properties personally owned by Sewing, and no funds were to be contributed to an alleged partnership."

In regard to the TRPA factors concerning partnership formation, Bowman asserts that "adequate evidence supports the jury's finding that the parties created a partnership and that Bowman was paying down an interest in their venture, not buying real estate." The evidence shows that Bowman made several payments over the course of the parties' dealings: $50,000 to invest in Rescue Properties, the $68,275 that Sewing retained from the investment in Rescue Properties, two additional payments of $50,000 to Sewing, and a $5,000 payment to Sewing. The jury could have reasonably concluded that Bowman contributed the money to form a partnership with Sewing and he made the continuous payments to pay down on his partnership contribution.

In regard to Sewing's fourth issue, we note that the jury was not required to believe Sewing's testimony that Bowman was to first buy an interest in the Wentworth and Chenevert properties before the partnership would be formed. Because the jury could have disbelieved his testimony on this point, we overrule Sewing's fourth issue.

Sewing asserts that his testimony regarding the right to receive profits, the intent to be partners, and the obligation to share in losses constitutes no evidence of these factors because his testimony was "conjecture and clearly conditioned on a circumstance that never occurred—the men's joint ownership of the properties." Again, however, the jury was free to disbelieve his assertion that co-ownership of the properties was a prerequisite to the formation of the partnership while taking into account his testimony regarding the terms of such a partnership. *See, e.g., Golden Eagle Archery,* 116 S.W.3d at 774–75 (stating that jury may "believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness"); *Travelers Pers. Sec. Ins. Co. v. McClelland,* 189 S.W.3d 846, 852 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (stating that jury could have disbelieved part of witness's testimony where he "appeared to backtrack" on his prior testimony).

Accordingly, we conclude that Bowman presented sufficient evidence on four of the five TRPA factors indicating the existence of a partnership agreement. *See* TRPA art. 6132–2.03(b). Viewing the evidence in

the light most favorable to the verdict, we further conclude that a reasonable and fair-minded fact-finder could find the existence of a partnership. *See City of Keller*, 168 S.W.3d at 810. Moreover, we conclude that the evidence supporting the jury's finding is not so weak as to make the finding clearly wrong and manifestly unjust. *Cain*, 709 S.W.2d at 176. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's finding of the existence of a partnership.[7] We overrule Sewing's seventh issue.

### Damages

■ In his sixth issue, Sewing argues that Bowman presented no competent evidence of the fair market value of his partnership interest because Bowman presented no expert testimony as to the value of his partnership interest and Sewing's testimony cannot serve as evidence of the partnership interest. In his eighth issue, Sewing argues that the evidence is legally insufficient in regard to the redemption price of Bowman's partnership interest, if any, because he submitted no evidence of the value of the Wentworth property. In his ninth and tenth issues, Sewing argues that the awarded damages are excessive and against the great weight of the evidence because "the value of [Bowman's] interest, if any, was less than zero [as] he owed the alleged partnership for his capital contribution and losses ... related to the properties" and the trial court erred in not providing set-offs to the jury's calculation of the redemption price.

The TRPA provides that "the redemption price of a withdrawn partner's part-nership interest is the fair value of the interest as of the date of withdrawal." TRPA art. 6132b–7.01(b)(1). The death of a partner constitutes an event of withdrawal. *Id.* art. 6132–6.01(b)(7)(A). And the redemption price has been referred to as a "buyout" of the withdrawing partner's interest. *Coleman v. Coleman*, 170 S.W.3d 231, 237 (Tex.App.-Dallas 2005, pet. denied). Interest is payable on the amount owed. TRPA art. 6132b–7.01(b)(2).

At trial, Sewing testified that, at the time of Bowman's death, Bowman had contributed approximately $211,000 to the development plan. He noted that the value of the Chenevert property had been appraised at approximately $700,000, when Sewing "put it on the market" in June 2006, and, in August 2005, "shortly after Bowman's death," it was valued at approximately $750,000. Sewing also interpreted his valuations in the document entitled, "BOWMAN–SEWING TRANSACTIONS," which listed the price for the Wentworth and Chenevert properties at $300,000 each. Sewing explained that he arrived at this number by taking the combined square footage of both properties and valuing them at $35 per square foot, giving a total value of $600,000, which he divided by two. Because the Wentworth property was larger, Sewing noted that his $300,000 valuation of that property was "underpriced." With 9,500 square feet, at $35 per square feet, Sewing would have valued the Wentworth property at $332,500. In explaining his valuations, Sewing testified, "I know those property values. I've been there 45 years." In June 2006, the Wentworth property sold for $390,000.

---

7. Sewing argues that the trial court erred in not excluding LeVesseur's testimony and, as a result, it is not competent evidence to support the jury's finding that a partnership existed. Having held that the evidence is legally and factually sufficient to support the jury's finding of a partnership agreement without relying on LeVesseur's testimony, we need not address this argument.

Sewing argues that the above evidence is not competent to establish the redemption price of Bowman's partnership interest because "[n]o one testified as to how to account for the partners' capital contributions or expenses" and "expert testimony by an accountant or other professional was necessary to properly guide the jury as to the proper partnership value." He asserts that Bowman "presented no expert evidence, or any other credible evidence at all, of [his] partnership interest, as required by Texas law." However, Sewing cites to no authority which would have required Bowman to provide expert testimony on the "fair value" of his partnership interest. *See* TRPA art. 6132b–7.01(b)(1). Instead, for the proposition that section 8.06 of the TRPA requires "the profits and losses that result from the liquidation of the partnership property [to] be credited and charged to the partners' capital accounts," he cites *Coleman*, 170 S.W.3d at 237. However, as explained in *Coleman*, section 8.06 applies only to the disposition of the partnership assets upon a winding up of the partnership. *Id.* at 238. In *Coleman*, the court held that section 8.06 did not apply where the redeeming partner had died, and, thus, withdrawn from the partnership, and there was no winding up of the partnership. *Id.* Here, the partnership's only "assets" at the time of Bowman's death were Bowman's capital contribution and, arguably, the two properties as valued by Sewing. We conclude that, under these circumstances, Bowman was not required to provide expert testimony on the value of his partnership interest.

Sewing further argues that his own testimony is not competent evidence of the value of the Wentworth and Chenevert properties because "a property owner cannot offer testimony with respect to anyone else's property," citing *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex.1996). In *Redman Homes*, both parties conceded that a homeowner's statements regarding the price that he paid for his home were not admissible to show its market value at the time that the home was destroyed by fire ten months later. *Id.* at 668. However, the court held that the homeowner was qualified to testify as to the market value of the home and his personal property as their owner. *Id.* at 669. Here, it is undisputed that Sewing owned both properties at the time of Bowman's death. "A property owner is qualified to testify to the market value of his property." *Id.* (citing *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex.1984)). "This evidence is probative if it is based on the owner's estimate of the market value and not some intrinsic or other value such as replacement cost." *Id.* Thus, the jury could have reasonably relied on Sewing's testimony regarding the value of his properties.

Sewing next argues that there is no competent testimony specifically regarding the value of the Wentworth property at the time of Bowman's death because the only evidence that Bowman offered concerning it was "a settlement statement from the sale of the property more than a year later on June 2006." However, the evidence also included Sewing's own valuation of the property in the "BOWMAN–SEWING TRANSACTIONS" document prepared in December 2004. The jury was not required to determine the exact market value of the property at the time of Bowman's death but only the "fair value" of his partnership interest. *See* TRPA art. 6132b–7.01(b)(1). We conclude that the above evidence would have enabled the jury to reasonably determine the fair value of Bowman's partnership interest.

Accordingly, we overrule Sewing's sixth and eighth issues.

In regard to his ninth issue, Sewing argues that the evidence is insufficient to support the jury's damage award and the damages are excessive and against the great weight of the evidence presented at trial because Bowman "owed the alleged partnership for his capital contribution and losses/expenses related to the properties." However, as noted above, the jury was free to disbelieve Sewing's testimony that Bowman's payment of $300,000 for receipt of a one-half interest in the two properties was a condition precedent to the formation of the partnership, and it was free to disbelieve some or all of Sewing's testimony regarding the expenses paid on the Chenevert property and whether they were expended pursuant to the partnership agreement and before Bowman's death. *See Golden Eagle Archery,* 116 S.W.3d at 774–75. Accordingly, we hold that the damages were not excessive and the evidence that supports the award is not so weak as to render the jury's award clearly wrong and manifestly unjust.

We overrule Sewing's ninth issue.

In his tenth issue, Sewing asserts that the trial court erred in not applying set-offs to the jury's partnership award. *See* TRPA art. 6132b–7.01(*l*). The TRPA provides that a "withdrawn partner ... may maintain an action ... to determine the terms of redemption of that partner's interest, including a contribution obligation or setoff under Subsection (c) or (d) or other terms of the redemption obligations of either party." *Id.* However, subsection (c) only states that a wrongfully-withdrawn partner is liable for contributions he "would have been liable to make," while subsection (d) states that the partnership may set off damages for "wrongful withdrawal." *Id.* art. 6132b–7.01(c),(d). As Bowman was not a wrongfully-withdrawing partner, the provisions in subsections (c) and (d) would not apply to him, and the

jury was entitled to disbelieve Sewing's testimony that there were any expenses incurred in furtherance of the partnership that Bowman was liable for. *See Golden Eagle Archery,* 116 S.W.3d at 774–75. Accordingly, we overrule Sewing's tenth issue.

## Attorney's Fees

In his eleventh issue, Sewing argues that the trial court erred in awarding Bowman attorney's fees because he "failed to plead and present evidence to sustain a judgment for such fees on his partnership claim." *See* TRPA art. 6132b–7.01(*l*). Sewing asserts that Bowman's plea for attorney's fees applied only to his breach-of-contract claim, on which he was unsuccessful, and an award of attorney's fees in an action to recover on a partnership interest requires a showing of "vexatious conduct." *See id.*

A trial court's award of attorney's fees will not be disturbed on appeal absent an abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998). Absent contrary evidence, we must presume that a trial court's judgment is valid. *Vickery v. Comm'n for Lawyer Discipline,* 5 S.W.3d 241, 251 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (stating court would uphold award of attorney's fees "if it can be upheld on any legal theory supported by the evidence").

A party "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8) (Vernon 2008). Bowman pleaded for attorney's fees under section 38.001(8), but Sewing argues that because Bowman did not recover on his breach-of-contract claim, he cannot recover attorney's fees. Sewing asserts that Bowman was required to plead for attorney's

fees under the TRPA, which states that "[i]f the court finds that a party acted arbitrarily, vexatiously, or not in good faith ... the court may assess ... reasonable attorney's fees" against that party. TRPA art. 6132b–7.01(*l*). However, "[s]ection 38.001(8) does not narrow its scope to claims of breach of contract, nor differentiate between types of contracts...." *½ Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 388 (Tex.2011) (holding that section 38.001(8) applied to claim for breach of obligation owed by drawer of check); *see also Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 61 (Tex. 2008) (upholding award of attorney's fees under section 38.001(8) in claim for breach of express warranty because claim, while not breach of contract, was "contract-based").

 Although Bowman did not recover on his breach-of-contract claim, his partnership-redemption claim was still based on an oral agreement. Accordingly, we hold that the trial court did not abuse its discretion in awarding him attorney's fees. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8); *see also Atterbury v. Brison*, 871 S.W.2d 824, 828 (Tex.App.-Texarkana 1994, writ denied) (holding that because plaintiff's claim was "founded on an oral or written partnership agreement," attorney's fees were recoverable under Chapter 38 in action for accounting of partnership interest).

We overrule Sewing's eleventh issue.

### Jury Questions and Instructions

In his twelfth and thirteenth issues, Sewing asserts that the trial court erred in not submitting his proposed jury questions and instructions regarding formation of the partnership, "the existence of a condition precedent to the parties' agreement or partnership," and the application of the statute of frauds.

 We review a trial court's decision to submit or refuse a particular question or instruction under an abuse of discretion standard. *See La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex.1998). When a trial court refuses to submit a requested question or instruction on an issue raised by the pleadings and evidence, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000) (referring to Texas Rules of Civil Procedure 277 and 278). The omission of a question or instruction constitutes reversible error only if the omission probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1(a); *see Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex.2003). Error in the omission of an issue is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment." *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579–80 (Tex. 2006); *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex.1980).

 A trial court must submit questions, instructions, and definitions that the pleadings and evidence raise. *See* TEX.R. CIV. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992). A trial court may refuse to submit a jury question only if no evidence exists to warrant its submission. *See Elbaor*, 845 S.W.2d at 243; *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex.1985) (citing *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965)). Conflicting evidence presents a fact question for the jury to decide. *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 862 (Tex.1999); *Brown*, 685 S.W.2d at 641–42; *Phillips Pipeline Co. v. Richardson*, 680 S.W.2d 43, 48 (Tex.App.-El Paso 1984, no writ).

Sewing first asserts that the trial court should have included a predicate question on the formation of a contract before the jury could answer affirmatively on the partnership issues. However, as noted above, a party need not prove the required elements of a contract claim in order to prove the existence of a partnership because a partnership can be implied from the facts and circumstances of a case. *Shindler*, 695 S.W.2d at 703; *see also El-hamad*, 2003 WL 22211543, at *3. In regard to Sewing's assertion that the trial court should have submitted an instruction stating that his previously-owned properties could not be considered partnership property, the jury heard evidence from which it could conclude that the two properties were not partnership assets. Rather, the jury could have considered the partnership agreement to pertain Bowman's entitlement to the proceeds from the development of townhomes and subsequent sale of the properties.

Sewing next argues that the trial court's partnership instruction to the jury was incomplete because it "failed to identify a specific business purpose," only stated that the partnership was "regarding the properties," and failed to include proper guidance as to what constitutes the right to participate in control of a business. Jury question number one tracked the five factors to consider in determining the existence of a partnership and properly defined a partnership as "an association of two or more people to carry on a business, as owners, for profit." *See* TRPA art. 6132b–2.02(a). Sewing cites no authority indicating that a trial court must in its instructions to a jury identify a "specific business purpose." Here, the trial court's charge to the jury sufficiently tracked the language of the TRPA, and the trial court did not abuse its discretion in not submitting further instructions regarding a "specific business purpose" or examples of the right to control a business. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994) ("When liability is asserted based upon a provision of a statute or regulation, a jury charge should track the language of the provision as closely as possible.").

In regard to Sewing's assertion that the trial court should have submitted an instruction on "the existence of a condition precedent to the parties' agreement or partnership," the jury found the existence of a partnership, necessarily rejecting Sewing's argument that Bowman's complete payment of $300,000 and the transfer of an interest in the Wentworth and Chenevert properties was a condition precedent to the formation of the partnership. Again, we note that the jury was free to disbelieve Sewing's assertion of a condition precedent, and the trial court did not abuse its discretion in not including an instruction on the issue. *See, e.g., Golden Eagle Archery*, 116 S.W.3d at 774–75.

Finally, Sewing argues that the trial court erred in not submitting "a Statute of Frauds fact question" to the jury asking "whether the transfer of an interest" in either of the two properties in question "was part of the alleged agreement in this case." Sewing's proposed questions are substantially similar to jury question number three, which asked,

> Did William C. Bowman and Richard Sewing bind themselves to a contract that included the following terms: 1) William C. Bowman's purchase of a one-half interest or 50% ownership in the properties located at 4810 Chenevert and 1718 Wentworth for $300,000; and 2) The development of townhomes on both properties to make a profit.

The jury answered, "Yes" to this question, but, in question number four, found that neither Sewing nor Bowman had failed to

comply with the agreement. It further found in jury question number one that Sewing and Bowman had formed a partnership regarding the "properties," and, in question number two, that the value of Bowman's "interest in the partnership" was $231,743.61. However, as noted above, the statute of frauds did not apply to Bowman's claim for redemption of his partnership interest.

Accordingly, we hold that the trial court did not abuse its discretion in not submitting to the jury Sewing's requested questions and instructions.

We overrule Sewing's twelfth and thirteenth issues.

### Conclusion

We affirm the judgment of the trial court.

Justice BROWN, dissenting.

Justice BROWN, dissenting.

While the facts of this case engender sympathy for Bowman's father, who paid his friend Richard Sewing over $200,000 but was not paid his money back, the statute of frauds bars enforcement of the alleged oral contract, and Bowman failed to prove any other basis for recovery of damages or attorney's fees. I, therefore, respectfully dissent.

### The Statute of Frauds Bars Bowman's Recovery

The Court properly distinguishes between (1) an oral partnership agreement to transfer an ownership interest in land to a partner or the partnership—an agreement that violates the statute of frauds—and (2) an oral partnership agreement to develop land for resale and share in the sale profits without transferring an ownership interest in the land—an agreement that does not. *Compare Beverly Found. v. W.W. Lynch*, 301 S.W.3d 734, 740 (Tex.App.-Amarillo 2009, no pet.) (holding that statute of frauds barred alleged joint venture agreement to convey working interest in mineral lease to joint venture); *Texas Nom Ltd. P'ships v. Akuna Matata Invs., Ltd.*, No. 04-04-00447-CV, 2005 WL 159459, at *5 (Tex.App.-San Antonio 2005 pet. denied) (mem. op.) (holding that statute of frauds barred oral partnership agreement giving partnership interest in oil and gas leases), *with Wiley v. Bertelsen*, 770 S.W.2d 878, 881 (Tex.App.-Texarkana 1989, no pet.) ("The statute of frauds does not apply to an agreement to pay a certain sum of money out of the proceeds of a future sale of land."); *Ward v. Crow*, 476 S.W.2d 77, 80 (Tex.Civ.App.-El Paso 1972, no writ) ("Oral agreements to share profits arising from the purchase and sale of real estate can be construed to be binding and not as contracts for a transfer or assignment of interest in real estate.").[1] But, contrary to the Court's holding, the agreement alleged at trial and found by the jury falls within the first category rather than the second, and the damages Bowman recovered depend on that unenforceable oral agreement.

1. *See also Pappas v. Gounaris*, 158 Tex. 355, 359, 311 S.W.2d 644, 646 (1958) ("land owned by a prospective partner at the time of the formation of the partnership does not become a partnership asset by a mere oral agreement of partnership even though such was the intention of the parties; in other words, in order to place in the partnership the title to property owned by one partner at the formation of the partnership, or to make such property a partnership asset, the agreement must be in writing the same as any other contract for the sale of land"); *City Products Corp. v. Berman*, 610 S.W.2d 446, 449 (Tex.1980) ("A partnership to deal with land, for example, may exist between persons when only some of them own the land. Some may furnish the use of property, and the other persons' membership in the partnership may consist of their contribution of services. Ownership of realty is not an essential element of every partnership.").

## A. The agreement Bowman pled and proved at trial was for a one-half interest in land

The distinguishing factor between property-related agreements barred by the statute of frauds and those that are not is whether the agreement provides for the transfer of an interest in land from one party to another. *See Berne v. Keith*, 361 S.W.2d 592, 597 (Tex.Civ.App.-Houston 1962, writ ref'd n.r.e.) ("an agreement to share in the profits of contemplated speculative deals in real estate simply does not involve the transfer of real estate, or an interest in real estate, within the meaning of the Statute of Frauds"); [2] *Mangum v. Turner*, 255 S.W.3d 223, 227 (Tex.App.-Waco 2008, pet. denied) ("Generally, the statute of frauds applies to an oral agreement when 'the performance promised requires an act that will transfer property in land.' ") (quoting *Palmer v. Fuqua*, 641 F.2d 1146, 1158 (5th Cir.1981)). A partnership agreement that requires the transfer of real estate to the partnership violates the statute of frauds because "an interest in real estate cannot become a partnership asset unless the agreement concerning the property is in writing the same as any other contract concerning the sale of land." *Carpenter v. Phelps*, 01–09–00203–CV, 2011 WL 1233312, at *8 (Tex. App.-Houston [1st Dist.] Mar. 31, 2011, no pet.).

On appeal, Bowman contends that his father's oral agreement with Sewing to develop land was not barred by the statute of frauds because he is "not seeking a transfer of any interest in the lands," but rather, "an accounting of a share in the profits as compensation for services rendered in [the] project." Bowman maintains that Sewing and his father formed an oral partnership "to redevelop and sell property" owned by Sewing and that their agreement did not include "convey[ing] title to the property but merely establish[ing] a venture to profit from its sale." In other words, according to Bowman, the parties' agreement does not run afoul of the statute of frauds because it was not intended to transfer the properties' ownership; the agreement was that he would share one-half in any profit from the properties' sale. But the agreement Bowman describes on appeal is not the agreement he asserted in his pleadings and proved at trial, nor is it the agreement upon which the jury based its damages award.[3]

2. In *Berne*, the plaintiff was "not seeking a transfer of any interest in" the defendant's real estate. 361 S.W.2d at 597. Instead, he sought "an accounting of a share in the profits as compensation for services rendered in a project involving speculation in real property which he asserts became due him upon completion of the project." *Id.* Here the damages sought by Bowman are not measured by profits or compensation but the value of the land.

3. The Court asserts that this dissent improperly conflates Bowman's partnership claim with his breach of contract claim, noting that these are two distinct claims and the jury was free to reject one while accepting the other. I agree with the Court that partnership claims and breach of contract claims are distinct legal theories of recovery and that Bow-man could have pleaded and proved a breach of an agreement to transfer land to a partnership—enforcement of which is barred by the statute of frauds—and yet separately proved a partnership between the parties that did not require the transfer of land—enforcement of which is not barred by the statute of frauds. But Bowman did not plead or prove a partnership between the parties that did not require the transfer of land. As detailed herein, he pleaded and proved an agreement to be partners in the co-ownership of the Chenevert and Wentworth properties. Because these properties were wholly owned by Sewing, the agreed upon partnership could not proceed without the transfer of an ownership interest in those properties. Moreover, the only evidence Bowman presented on damages requires the jury to base the value of the partnership interest on the value of the prop-

In his pleadings, Bowman alleged that his father and Sewing entered into an agreement under which Bowman's father provided $260,000 "as capital for the purpose of *acquiring* and rehabilitating" the Chenevert and Wentworth properties and that the agreement "created a partnership in that the parties associated as *co-owners* to carry on a business for profit." (emphasis added). He repeatedly asserted that his father and Sewing "would each own 50% of the properties" under their agreement and that the $260,000 investment was to be used for the "purchase" of the properties. Consistent with his pleadings, in his opening statement, Bowman's counsel told the jury that plaintiff's exhibit 10C [4] "lays out what the partnership agreement is," showing the Chenevert and Wentworth properties as the partnership's "first two acquisitions." He stated, "Those are the properties that Mr. Sewing is going to contribute to this partnership and he's saying [in exhibit 10C] that when he gave the partnership—when he contributed to the partnership they were worth $300,000 each for a total of $600,000. That is going to be—was Mr. Sewing's contribution to this

partnership." Bowman's evidence at trial conformed to this theory of the case.[5] And in his closing argument, Bowman's counsel continued this theme, stressing evidence of an agreement for "50 percent ownership," noting that this was "consistent with the plaintiff's case," and pointing to plaintiff's exhibits discussing a "half interest in [the Chenevert and Wentworth properties.]" At Bowman's urging, the jury found that the parties "formed a partnership regarding the properties"—without any reference to "services rendered" or a right to share in sales profits independent of ownership.[6]

On appeal, Bowman relies largely on Sewing's testimony to support his re-framing of the agreement as one for a share of profits on the sale of the properties rather than one for an interest in the land itself. But Sewing's testimony does not support this description of the parties' agreement. Sewing testified that he and Bowman's father discussed an agreement to enter a partnership for joint ownership of the properties but that they never consummated that deal because their plans changed when Bowman's father grew ill.[7] This tes-

erties—not the value of any work performed on the properties or any proceeds from the sale of the properties, but the value of the properties themselves. These damages presume that the partnership had an interest in the properties themselves, but the statute of frauds bars such an interest.

4. Plaintiff's exhibit 10C, titled "Bowman–Sewing Property Transactions," lists monetary contributions made by Bowman's father and Sewing and identifies the Chenevert and Wentworth properties as "acquisitions." It shows that Bowman's father owed $76,725 to reach a proposed investment of $300,000, identifying this amount as the "Bowman balance for 1/2 interest in [the Chenevert and Wentworth properties.]"

5. For example, Bowman's first witness, Craig LeVesseur, testified that his understanding was that Bowman's father paid the funds to Sewing "to acquire ownership in the Chenevert property and Wentworth property[.]"

Bowman also relied on LeVesseur's notes and letters, which referred to an "investment in Houston land/homes" and a "real property investment opportunity" in Houston. Similarly, Bowman relied heavily on plaintiff's exhibit 10C and an earlier version of the same document, plaintiff's exhibit 2, both of which provided for Bowman to purchase a "1/2 interest in [the properties.]"

6. The jury also found that the parties agreed that Bowman would purchase a "one half interest, or 50% ownership in" the Chenevert and Wentworth properties for $300,000 and to develop townhomes on those properties "to make a profit," but that Sewing did not breach the parties' agreement.

7. Bowman argues that Sewing's testimony that Bowman was "buying into something that's worth $600,000 ... more naturally signifies acquiring an interest in a joint venture and funding its project rather than acquiring

timony expressly relates to a proposed agreement to "acquir[e] land" and for Bowman's father to "buy[ ] the land." It does not support Bowman's new characterization of the parties' agreement on appeal, and he points to no evidence of his own that does. Absent such evidence, we must presume that the partnership agreement found by the jury was the one Bowman proved at trial—an agreement to form a partnership that would own the Chenevert and Wentworth properties. Because this agreement requires the transfer of an ownership interest in land from Sewing to the partnership, its enforcement is barred by the statute of frauds. *See* TEX. BUS. & COM.CODE ANN. §§ 26.01(a), (b)(4) (Vernon 2009); *see also Beverly Found.*, 301 S.W.3d at 740; *Texas Nom*, 2005 WL 159459, at *5.

### B. The jury's damage award depends on the unenforceable oral agreement to transfer an ownership interest in land

Even if Bowman had put on evidence of an agreement to form a partnership under which Sewing would retain full ownership of the Chenevert and Wentworth properties but Sewing and Bowman's father

would share in "profits" made on the sale of these properties in exchange for "services rendered," Bowman's recovery would fail because that agreement does not provide a basis for the jury's damages award. The jury did not award damages based on a calculation of profits or payments owed for services rendered; it awarded damages based on "the value of William C. Bowman's interest in the partnership on the date of his death." The jury placed that value at $231,743.61.

The only evidence to support this value is the evidence of the Chenevert and Wentworth properties' worth. Based on the evidence he presented at trial, Bowman informed the jury that the combined value of the Chenevert and Wentworth properties, minus the amount owed on them, was $1,017,000, and he asked them to "take half of that, ladies and gentlemen, and that is the value of the partnership." He further suggested that the jury could reduce that value by some of the expenses on the property claimed by Sewing, the reliability of which he contested.[8] If the partnership owned the Chenevert and Wentworth properties, as Bowman argued before the jury, Bowman would be entitled to recover on his father's interest in the

---

land, which one 'buys' but does not 'buy into.' " Taken in context, however, it is clear that the "something" Sewing is referring to is the property. Sewing explained, "I'm selling him half of something I already own." Sewing owned the two properties; he did not "own" a joint venture. And the documents drafted by Sewing, on which Bowman relied extensively at trial, provided for Bowman to obtain a "1/2 interest in 4810 Chenevert and 1718 Wentworth," not a one-half interest in a joint venture. Bowman's counsel described the agreement as an "investment ... to get the 50 percent ownership," and Sewing responded that "to become 50 percent, you're buying the land, that's where we're starting ...."

Bowman also seeks to isolate one portion of Sewing's testimony that he agreed with Bow-

man to establish a partnership to develop and sell townhouses on the property. Again, we cannot ignore the context of his statement. There is no evidence that the agreement was divisible. Therefore, we cannot ignore the remainder of Sewing's testimony about the agreement in which he testified, without equivocation, that "the only thing [Bowman's] really buying is land to be developed," that the transaction involved Bowman "buying the land," and that Sewing was selling Bowman "half of something I already own" (i.e. the land).

8. In his expense summaries, Sewing claimed $448,273.34 in expenses on the Chenevert property and $108,224.26 in expenses on the Wentworth property.

partnership based on the properties' value. But the partnership did not own the property because the statute of frauds bars the transfer of an interest in the properties from Sewing to the partnership in the absence of a written agreement. *See* Tex. Bus. & Com.Code Ann. §§ 26.01(a), (b)(4).

Bowman attempts to sidestep the statute of frauds on appeal by arguing that the jury's award reflects not the value of an ownership interest in land but the value of a "venture to profit from [the properties'] sale"—i.e., "an accounting of [his father's] share in the profits" from the sale of Chenevert and Wentworth properties. But Bowman did not put on evidence of the value of any "profits" on the sale of these properties—his damages evidence centered on the value of the property that he alleged the partners jointly owned. For example, with respect to the Wentworth property, Bowman sought $390,000—the amount for which the property sold in 2003. "Profits," however, do not include all proceeds on a sale; they are the net of the proceeds and the expenses, including the original purchase price. Bowman did not present any evidence of the amount Sewing paid for the Wentworth property. While Bowman was free to contest Sewing's evidence of expenses on the property, it was uncontroverted that Sewing "bought" the Wentworth property. Without evidence of the purchase price, the jury could not determine the value of any profits on resale. *See Texaco, Inc. v. Phan,* 137 S.W.3d 763, 771 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (observing that recovery of lost profits must be based on net profits, accounting for all expenses, rather than gross profits); *see also Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (stating that testimony of amount of expected income that would have been received was not the correct measure of damages for lost profits).

The Court endeavors to avoid this issue by substituting the term "proceeds" for "profits": "Bowman's claim for redemption of his partnership interest may include an interest in the proceeds from the sale of the two properties without resulting in a transfer of interest in the two properties to him." Slip op. at 15. While an agreement to share in "proceeds" rather than "profits" would not require an accounting for the original purchase price and expenses, there was no evidence of such an agreement.[9] Nor did the jury find such an agreement. Although the jury made specific findings of a partnership agreement and of the terms of the parties' agreement, the jury's findings included no term relating to the proceeds, rather than profits, on the sale of the properties.

## C. Sewing did not execute a legally sufficient writing

Bowman contends in the alternative that Sewing's December 8, 2004 letter satisfies the statute of frauds such that the parties' agreement effectively transferred a one-half interest in the Chenevert and Wentworth properties to Bowman's father. In the letter, Sewing informs Bowman, "I am having the legal document prepared per our discussion: 50% ownership."

9. The few references to the word "proceeds" in the witness testimony are unrelated to the existence of an agreement: (1) when asked what types of services he provided, Bowman's father's financial planner referenced some proceeds Bowman's father was expecting from a lawsuit; (2) Sewing sometimes referenced the amount Bowman's father had paid to him as "investment proceeds"; and (3) when asked whether any of the proceeds from the sale of the Chenevert property went to Bowman's father, Sewing's wife answered, "No." Nor did any of the evidence refer to an agreement to share in "revenues," "income," or other terms with a similar meaning.

To satisfy the requirement that a written agreement to transfer land must contain a sufficient description of the land, Bowman makes two contentions. First, Bowman contends that the evidence demonstrates that a legal description was enclosed with this letter. The evidence did not establish this assertion. The property description was a separate exhibit. It was not dated and there was no oral testimony that it was enclosed with the December 8 letter.[10]

Second, Bowman asserts that the street address of the properties is specified in a worksheet prepared by Sewing, which was enclosed with the December 8 letter, and that a property description based on a street address is sufficient. The December 8 letter refers to an undated "payment history and balance." Bowman contends that this is a reference to the worksheet, titled "Bowman–Sewing Transactions." Sewing responds that this reference is not "explicitly" to the worksheet. The worksheet reflects a history of payments and the "balance" owed by Bowman. The reference in the letter is sufficiently explicit to implicate the worksheet. The worksheet, however, does not provide a sufficient description of the land in question.

An agreement to transfer an interest in real estate "must furnish the data to identify the property with reasonable certainty." *Duncan v. F–Star Mgmt., L.L.C.*, 281 S.W.3d 474, 478 (Tex.App.-El Paso 2008, pet. denied). "A description of real property must be reasonably certain so that *a party familiar with the locality* could identify the property to the exclusion of other property." *Dunworth Real Estate Co. v.*

*Chavez Props.*, No. 04–07–00237–CV, 2008 WL 36222, at *4 (Tex.App.-San Antonio Jan. 2, 2008, no pet.) (mem. op.) (emphasis added). But the worksheet does not identify the locality; it provides a partial street address without any reference to a city, county, zip code or state, which is particularly problematic here where the parties resided in different states. Even the street address is incomplete, failing to specify whether the named street is a "street," "avenue," "road," "lane," "drive," "boulevard," or the like.[11] Moreover, the worksheet grants Bowman a one-half interest in the properties in exchange for $300,000. It is undisputed that Bowman did not pay Sewing the full $300,000.

Thus, Bowman did not present evidence of a written agreement sufficient to satisfy the statute of frauds.

**D. Bowman cannot avoid the statute of frauds under a partial performance exception**

Bowman further contends that his father's partial performance of the parties' agreement, through his payments of over $200,000, satisfies the statute of frauds. "Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud." *Resendez v. Maloney*, No. 01–08–00954–CV, 2010 WL 5395674, at *7 (Tex. App.-Houston [1st Dist.] Dec. 30, 2010, pet. denied) (mem. op.) (quoting *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex.

---

**10.** Sewing testified that he sent the property description to Bowman but he could not recall when.

**11.** In the Houston area alone, there is a Wentworth Street, a Wentworth Lane, and a Wentworth Court. *See International–Great N.R.*

*Co. v. Reagan*, 121 Tex. 233, 49 S.W.2d 414, 416 (1932) (taking judicial notice of maps in public record); *see also City of Austin v. Leggett*, 257 S.W.3d 456, 466 (Tex.App.-Austin 2008, pet. denied) (consulting satellite maps available on google maps website).

App.-Dallas 2002, pet. denied)). Virtual fraud occurs when "because of his reliance on the contract, a party has suffered a substantial detriment for which he has no adequate remedy, and the other party would reap an unearned benefit if permitted to invoke the statute of frauds." *Id.* (citing *Exxon,* 82 S.W.3d at 439). But Bowman did not plead partial performance or obtain a jury finding on this claim. And the damages for partial performance are reliance damages, which Bowman did not seek. *See Exxon,* 82 S.W.3d at 441.

Thus, Bowman did not establish the partial performance exception to the statute of frauds.

### E. Conclusion

The oral agreement that Bowman proved and was awarded damages on at trial is barred by the statute of frauds. Bowman proved no other agreement and no other basis for the jury's damages award. The statute of frauds therefore bars his recovery.

### Attorney's fees

Because Bowman was not entitled to recover the damages the jury awarded him and did not seek or recover any other relief, he was not the prevailing party. He therefore may not recover attorney's fees under chapter 38 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008); *see also MBM Fin. Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 666 (Tex. 2009) ("To recover fees under [chapter 38], a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages."); *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.,* 134 S.W.3d 195, 201 (Tex.2004) ("While Mustang did have a valid claim against Driver, it was not entitled to recover attorney's

fees because it was not awarded damages on its breach of contract claim.").

### Conclusion

For these reasons, I respectfully dissent.